CLARENCE H. HERSHEY, complainant,

*v.*

STONE & HERSHEY, a corporation, defendant.

[Decided July 29th, 1932.]

*Messrs. Lum, Tamblyn & Colyer (Mr. Chester W. Fairlee,* of counsel), for the receiver.

*Messrs. Hendrickson & Hendrickson,* for the creditors.

BERRY, V. C.

This matter is before me on the return of an order to show cause why the final account of the receiver of the defendant company should not be approved, fees of receiver and his counsel fixed and allowed, and the receiver discharged.

Milton L. Dake was appointed receiver of the defendant company by me on January 24th, 1929, on application of the president of the defendant company and by consent of the

company itself. The appointment was confirmed on February 5th, 1929.

This case presents a shining example of how a receivership should not be conducted.

According to the inventory, filed on October 17th, 1929, the assets of the company on January 24th, 1929, consisted of promissory notes receivable, having a face value of $28,595.44 and an estimated value of $9,123.46; accounts receivable having a face value of $66,582.39 and an estimated value of $27,224.81; office furniture having an estimated value of $300; lumber which cost $5,088.83, estimated value $3,911.21; three automobiles, estimated value $675; cash in banks $7,473.58 of which $6,973.95 was applied by the depository banks to notes of the defendant company held by said banks, leaving a balance of $499.63 in cash actually received by the accountant. The total face value of the assets of the defendant company was $108,715.24 and the receiver's estimated value was $41,734.11. No appraisement of these assets, except by the receiver, was had. (It is, perhaps, a mere coincidence that the total cash receipts of the receiver amount to exactly $41,414.17.)

The liabilities of the defendant company as of January 24th, 1929, according to the inventory, were as follows:

| | |
|---|---:|
| Notes payable | $20,636.13 |
| Accounts payable | 75,799.98 |
| Pref. salary claims | 167.72 |
| Contingent liabilities as endorser on trade notes | 102,702.59 |
| Total liabilities | $199,306.42 |

On October 15th, 1929, the receiver filed his first report and account showing cash received amounting to $20,381.56, cash disbursed $6,137.90, and a balance of cash on hand amounting to $14,243.66. The receiver then reported a balance of assets on hand as follows:

| | |
|---|---:|
| Balance of notes receivable | $32,480.85 |
| Balance of accounts receivable | 45,541.44 |
| Balance of lumber | 1,365.54 |

He also reported preferred claims filed and allowed amounting to $390.21, unsecured claims of $109,023.35 and contingent liability claims amounting to approximately $25,000.

After due notice to all creditors and stockholders, that account was approved and allowances of $1,800 to the receiver and $900 to counsel were made, and the receiver was directed to pay the preferred claims in full and a dividend of ten per cent. to unsecured creditors, which was done.

On April 12th, 1932, the receiver filed his second and final report and account, whereupon it was referred to a master for audit and an order to show cause issued thereon. The master was directed to audit both the intermediate and the final accounts of the receiver and this has been done. As a result of such audit the receiver has been obliged to file an amended final account because of the numerous errors and irregularities discovered by the master and many items of discharge which the master refused to approve, some of which will receive special mention later.

In his original final account the receiver reported cash received between July 23d, 1929 (the date as of which his first account was filed), and April 1st, 1932, of $21,032.61. The amended account shows that this item should have been $20,918.20. Total disbursements shown by the original account were $22,548.92 while in the amended account this item is reduced to $21,913.44. Included in this sum, as it appears in the amended account, is an item of $858.75 for personal expenses of the receiver, of which the master recommended that all but $450 should be disallowed. The balance of cash on hand as of April 1st, 1932, as shown by the original final account was $12,727.35; that shown by the amended account is $13,250.40.

So many irregularities in the conduct of this receivership have been disclosed by the master's audit of the receiver's accounts that some detailed consideration of them is necessary.

Although the receiver's original final account showed the balance of cash on hand as of April 1st, 1932, to be $12,727.35; and the amended account a balance of $13,250.40,

the only money on deposit in any bank to the credit of the receiver on that date was the sum of $5,409.93 deposited to his credit in a small out of town bank, in which he had opened an account shortly after his appointment. On April 15th, 1932, however, three days after the receiver's final account was filed, he deposited the sum of $7,000 in the Perth Amboy Trust Company at Perth Amboy, New Jersey, to his credit as receiver, and on April 21st, 1932, he deposited the further sum of $1,200 in the same account. This circumstance led to an inquiry by the master which disclosed the following astounding facts: On September 3d, 1929, the receiver drew a check on his receiver's bank account for $3,000 to his own order; on October 30th, 1929, he drew another check on the same account for $2,000 to his own order; and on September 21st, 1931, he drew a third check to his own order for the sum of $2,000. None of these checks were mentioned in the receiver's account, nor were they shown by his check stubs. His check-book stubs do contain, however, a record of check No. 120 under date of November 25th, 1929, drawn to his own order for $1,800, marked "in payment of receiver's fees," and this item appears in his final account of disbursements. The check itself, however, was not produced, and the bank statement shows no such payment. The two first checks aggregating $5,000 he deposited in the bank account of Milton L. Dake Company, which is the corporate name of the receiver's individual business. The receiver claims that the $2,000 check drawn on September 21st, 1931, was in payment of his $1,800 fee allowed by the court on his first account; that the bookkeeper made a mistake and drew the check for $2,000 instead of for $1,800, and that he kept the extra $200 of the check for expenses; this notwithstanding the fact that there appears amongst his check stubs a notation of an $1,800 check drawn to his order on November 25th, 1929, in payment of this fee. Accepting the receiver's own explanation of this transaction leaves unexplained the check stub entry of check No. 120 for $1,800. The $5,000 represented by the other two checks did not again appear in his receiver's account until April 15th,

1932, when it was deposited in the Perth Amboy Trust Company. The receiver's explanation of this transaction as reported by the master, and supported by the receiver's testimony before the master is:

"That while he was at the * * * Trust Company, where he had an account for twenty-five years, arranging for loans for his company he was told by the bank that he would have to pay off his loans, and he figured that as long as the bank was forcing him to pay off his company's loans, he was not going to keep any money in the * * * Trust Company, and take a chance of there being a loss to the creditors of Stone & Hershey.

"That he had in the * * * Trust Company quite a number of personal loans; that he had put up with the bank some insurance money; that the cashier of the bank told him that the withdrawals in the bank had exceeded its deposits; that he spoke to Mr. McQuade, an attorney and an officer of the Milton L. Dake Company, who advised him that if anything happened to the bank, the creditors would have to take what they could get, and that his whole idea was to have the money for the creditors when the time came to disburse it.

"The two checks, aggregating $5,000, he first deposited in the bank account of the Milton L. Dake Company, and within a few days withdrew the $5,000 and placed it in his private vault which he rented in the National Newark and Essex Banking Company, where it remained until he made the deposit in the Perth Amboy Trust Company on April 15th, 1932, of $7,000, said deposit being made up of the $5,000 cash which he removed from his safe deposit box and a $2,000 check drawn on the same day by the receiver on his account in the * * * Trust Company to the order of the Perth Amboy Trust Company.

"That the $1,200 deposited in the Perth Amboy Trust Company on April 21st, 1932, was made by a check of the Milton L. Dake Company. The receiver now claims that there is more money in the receiver's account in the Perth Amboy Trust Company and in the National Newark and Essex Banking Company than belongs in the receivership.

"That he kept no record of the moneys which he placed in the safe deposit box, belonging to the receivership of Stone & Hershey, or his personal money, or to the Milton L. Dake Company. He has no record of the total amount he put in the safe deposit box. He admitted that in case of his death there would have been no way of proving who was entitled to the funds in said box.

"The receiver testified that before he made the deposit in the Perth Amboy Trust Company there was almost $7,000 in cash in the safe deposit box, some of which did not belong to the receivership of Stone & Hershey, but belonged to the Milton L. Dake Company and the receiver personally."

The receiver's explanation of the $5,000 item is naive, to say the least; perhaps "asinine" would be the better word. An examination of his testimony before the master discloses that he had some doubt as to the solvency of the bank where he maintained his receiver's account and claims that this was his main reason for withdrawing this $5,000 from the account; but it is significant that he redeposited both checks in the account of his own company, Milton L. Dake Company, in the same bank, almost immediately, and that after he had withdrawn this $5,000 from the receiver's account there still remained over $14,000 to his credit as receiver in that bank. The receiver testified that after the deposit of the two checks aggregating $5,000 in the account of Milton L. Dake Company he withdrew that sum from the bank, not all at one time, but in amounts of $200, $300 and $400 at a time, and took the cash and deposited it in the safe deposit vault in the Newark bank, "because I did not want to disturb my own moneys over there. I was afraid they would call my loans and I would go busted before I could get the money out of the bank." The only reasonable conclusion to be drawn from this transaction is that for a period from September 3d, 1929, to April 15th, 1932, the receiver had in his possession, available for his own personal use as he saw fit, the sum of $3,000 of trust funds which belonged in the receiver's account; and that from October 30th, 1929, he likewise had $2,000 of such funds; and further, assuming

that his explanation of the $2,000 check of September 21st, 1931, is correct, although it is open to serious doubt, he still has $200 of that sum to which he is not entitled, no authority having been given him to retain those moneys. The receiver will be charged with six per cent. interest on these several sums for the periods indicated. The check stub entry of check 120 for $1,800 is probably a false entry, as no such check was ever paid by the bank. The purpose of this entry is obscure and unexplained.

It further appears from the master's report that on August 6th, 1931, the receiver collected $2,436.08 from one of the insolvent company's debtors and deposited it in his own company's bank account. How long it remained in that account is uncertain. He claims he had to leave it there for some time because the bank had called his personal loans and that he withdrew it in small amounts of cash from time to time and put it with other cash in his safe deposit box. He charged himself in his final account with this item at $2,236.08 instead of $2,436.08. This money never reached his receiver bank account until April 15th, 1932, three days after the final account was filed, if at all. The receiver will be charged with six per cent. interest on $2,436.08 from August 6th, 1931, until the fund was, or is, returned. Seven other items of receiver's collections are understated in his account in amounts varying from $25 to $65 and totaling $337.57, for which he must account. It also appears that he has mixed personal funds and funds of others for whom he had made numerous collections on commission, with receivership funds in the receiver's individual business bank account.

The master also reports that the receiver claims credit for salaries paid by him to bookkeepers, stenographers and assistants amounting to $3,494.07. Among these assistants was C. H. Hershey, the complainant in this suit, who was paid the sum of $557.20. Checks totaling $900 and drawn to the order of another employe were endorsed by him to Milton L. Dake, but never put through the bank. The receiver claims he paid this employe in cash and now claims reim-

bursement. The item will be disallowed. The master's report in this connection is both illuminating and interesting, but is omitted here because of its length. It appears that this latter employe had been in the employ of the receiver for two years prior to the receiver's appointment and is still in his employ and during all that period has received full time salary from the receiver's company, the Milton L. Dake Company. In addition to the checks aggregating $900 the receiver claims credit for $1,188 paid to this same employe. This sum will also be disallowed.

I have carefully read the transcript of the testimony taken before the master in connection with the audit of the receiver's accounts, and find that the report of the master is in all particulars fully justified. All of the expenses referred to, involving the employment of numerous assistants, were wholly unauthorized and were incurred by the receiver at his peril. In addition to those items specifically mentioned by the master in that portion of his report above referred to it appears that the receiver expended the sum of $1,959.16 for counsel fees which were totally unauthorized. Shortly after his appointment, and upon his application, the receiver was authorized to retain Lum, Tamblyn & Colyer as his counsel, to "render such legal services to the receiver as may be required by him in the performance of his duties as such receiver." Notwithstanding this authorization the receiver appears to have employed other counsel as and when he saw fit, fixing their fees and paying them such sums as in his judgment he thought proper, without any authority whatever from the court. It is true that most of this expense was incurred in collections by foreign attorneys and was possibly necessary under the circumstances; but it is believed that better results at less cost would have been obtained had all these collections and legal matters been handled through the office of the receiver's counsel duly appointed. Except that it is inferred from the master's report that this expense was necessary, the receiver would be surcharged.

It is clear that there was little co-operation between the receiver and his duly appointed counsel, because of the re-

cciver's sublime egotism. Not only did the receiver ignore his appointed counsel, but he actually consulted counsel for the creditors, and on the return of this order to show cause such counsel appeared and attempted to justify and defend the receiver for the transactions disclosed by this audit.

The receiver also paid a firm of accountants the sum of $800 for an audit of the insolvent company's books, without any authority from the court. He has expended in his administration of the insolvent estate for services of assistants the sum of $6,253.23, without any authority whatever, much of which might very possibly have been dispensed with had the estate been properly administered. The receiver is not a novice in affairs of this kind, as it appears that he had twice before served as receiver of insolvent corporations by appointment of this court. He was at one time president of the Lumbermen's Association, and it was because of this fact, and the recommendation of counsel for complainant and defendant, in whom I had, and still have, the utmost confidence, that he was originally appointed by me, although it was against my better judgment. The receiver himself now says his appointment was a mistake, as appears from his voluntary statement for the record, hereinafter recited in part. But notwithstanding his admitted poor administration and incompetence, he now has the audacity to ask for additional fees to the amount of $5,000 and his counsel asks for an additional allowance of $2,500. A receiver is an officer and representative of the court; is responsible directly to the court for his official acts; is liable for fraud or negligence resulting in injury or loss to the estate; incurs unauthorized expenses at his own peril; must keep regular and accurate accounts of receipts and expenditures; cannot act on his own discretion without leave of court; must not mingle trust funds with personal funds; and he will be held to a strict accountability for all his acts, either of omission or commission; in short, he will be held to the same measure of responsibility as a trustee, which he, in fact, is. The receiver's administration has already cost this estate over $9,000, which is in excess of twenty per cent. of the amount of cash realized

by him, and no further allowance will be made to him. The court will not ratify any unauthorized expense unless it appears to have been *necessarily* incurred. The item of $858.75 for personal expenses for which he claims credit will be reduced to $450 in accordance with the recommendation of the master. He will be required to restore to the trust estate, if he has not already done so, the following items:

$3,000.00 Represented by check dated September 3d, 1929, and interest at six per cent. to April 15th, 1932.

$2,000.00 Represented by check dated October 30th, 1929, and interest at six per cent. to April 15th, 1932.

$2,000.00 Represented by check dated September 21st, 1931, and interest at six per cent. to April 15th, 1932. (This item should be reduced to $200 on the assumption that the check stub entry concerning the $1,800 payment is false, as it appears to be.)

$2,436.08 Collected from Babylon Mill and Lumber Company and deposited in the account of Milton L. Dake Company, and interest at six per cent. to date of repayment.

$337.57 Representing collections on seven accounts not reported.

The following items in the account will be disallowed:

$2,088.00 For salary to Klimowicz.

$858.75 Expenses, less $450, as recommended by the master.

The receiver has filed voluminous affidavits indicating the services which he has performed in the administration of his trust. There is no doubt that a large amount of time and effort has been expended by him in the performance of his duties as receiver, but I think it is apparent that there has been much lost motion, and in view of the results obtained, and the questionable transactions and misconduct of the receiver as disclosed by the master's report, and especially in view of the amount of money expended by him for payment of assistants in his work, and for which allowance has been made, it is deemed that he has already been well paid for

his services. Except that I am unable to satisfy myself that his misconduct is criminal, rather than the result of ignorance and ineptness, he would be directed to restore what he has already been paid.

(Since the above was written I have asked the receiver to produce before me the bank records, including check stubs and canceled checks of the Milton L. Dake Company covering the period of the receivership, in order that I might check some of his testimony before the master and determine to my own satisfaction this question of misconduct, and although this request was made more than ten days ago, it has not yet been complied with. I am informed by his counsel that a similar request was made by the master and that the receiver then claimed that he could not comply because all such records had been destroyed. This is the usual refuge of those who do not desire to have their personal conduct too closely scrutinized. It is not accepted as a sufficient explanation of his failure to comply with such a reasonable request, but rather as proof of his culpability and unfaithfulness to his trust. An unfaithful trustee deserves no reward, and has only himself to thank if the results of such unfaithfulness bear down hard upon him. In addition to the items for which the receiver will be required to account as above stated, he will be directed to pay back to the trust fund the fee of $1,800 previously allowed him.)

Notwithstanding the failure of the receiver to co-operate with counsel appointed by the court I think it is evident that counsel has performed services for which they have not already been compensated. An additional allowance of $600 will be made.

At the conclusion of the receiver's examination before the master who made this audit, the receiver voluntarily made a lengthy statement for the record, which is, in part, as follows:

"With the permission of the court, I should like to enter the following memorandum on the record, to the end that the court may be informed of the views of at least one business man on the question of receiverships:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"When Stone & Hershey became insolvent, a great many of the creditors of that company, to my knowledge, felt that a wholesale lumber concern could only be liquidated by one familiar with the business, and as I had had previous experience at the appointment of Vice-Chancellor Bentley in liquidating such a company, I was recommended to the vice-chancellor for this particular receivership both by Lum, Tamblyn & Colyer, solicitors for the complainant, and by William L. Brunyate, solicitor for the corporation.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"I wish, however, emphatically to state that I have come to the reasoned conclusion that no business man is either competent or equipped to properly handle receivership cases, despite the general opinion of business men to the contrary. Personal experience has taught me otherwise. Even though a receiver has the best of legal counsel, he is confronted daily with innumerable questions involving points of law and procedure, and perhaps out of pride of his own business ability he continually seeks to solve these questions himself—often wrongly.

"Moreover, no business man has the office equipment for such services. If he really is a competent business man, he only has such help in his own business as is necessary for his own uses when used at one hundred per cent. capacity. If he takes on a burdensome receivership he must either get additional help at a greater expense to the receivership, or he must impair his own business organization. Another difficulty is that a business man is accustomed to achieve results by practical means. Many times these practical short cuts, while wholly justifiable from the standpoint of a business man, run afoul of legal ethics and technicalities of the law. This only involves the average business man in more difficulty which a lawyer would escape.

"After two experiences in liquidating insolvent corporations, both in businesses with which I am entirely familiar, I am constrained to say that I neither have the facilities nor adequate knowledge of legal technique to liquidate an insolvent corporation in my own line of business, and I feel

certain that the average business man is in the same position despite their opinion to the contrary. Certainly, a business man could not liquidate an insolvent corporation in any other line of business than his own with the dispatch that a lawyer can.

"My own final conclusion is that not only a lawyer but a lawyer of greater than average ability is required to properly liquidate insolvent corporations."

With this statement I am in entire accord.

And, it may well be added, that the certain knowledge of a lawyer that disbarment will result from unfaithfulness to his trust is a guaranty of fidelity above that afforded by the usual receiver's bond, too little appreciated by the general public. Also, that the appointment of lawyers as receivers of insolvent corporations results, as a general rule, not only in more efficient, but in more economical administration, particularly as the appointment of counsel for such receivers is usually unnecessary, and thus a duplication of fees is avoided. On the other hand, a layman receiver without counsel to guide him is like a ship without a rudder. There are undoubtedly cases in which special circumstances require the appointment of business men as such receivers, as where the corporate business is to be continued, or where a reorganization is contemplated, although in the latter class conceivably the modern lawyer is better equipped for the task by both education and experience than is the ordinary business man. But where the duties of the receiver consist mainly of marshalling and liquidating assets, as here, it has been my experience that better results are obtained by the appointment of lawyers of recognized ability and standing at the bar and in whom the court has complete confidence based upon its own knowledge. In the last analysis, the responsibility for such appointments is that of the court itself, and that responsibility justifies the court in making its own selection of its appointees. When the responsibility is shifted to other shoulders it will then be time enough for this court to surrender its ancient prerogative.

I will advise an order in accordance with these conclusions.

ADDENDUM.

Since the foregoing opinion was filed I have received from counsel for the receiver the check stubs and canceled checks of the Milton L. Dake Company covering the period of the receivership, but the bank statements requested have not been received. I have carefully examined such records as I have received, and they show beyond peradventure of doubt that the receiver appropriated receivership funds to his own personal use throughout the greater period of his trusteeship, as will appear from a statement of some of the information gleaned from these records.

On September 1st, 1929, the bank balance of the Milton L. Dake Company was $182.70. No deposits were made in this account on September 1st and 2d; but on September 3d, three deposits of $1,935.91, $18 and $3,000 respectively were made. The third item was the $3,000 check drawn on the receiver's account on September 3d, 1929, to the receiver's own order. On the same day the company paid two of its notes, one of $2,000 and the other for $3,000, held by the bank. This appears from entries on check stubs Nos. 2603 and 2604. By the issuance of other checks the company's bank account was overdrawn $3,938.01 at the conclusion of the day's business. During the month of September the withdrawals from this account exceeded the deposits by $3,503.95, which was the amount of the overdraft on October 1st. On October 28th, the company paid its note of $3,000. It appears from the testimony before the master that the receiver's check of October 30th, 1931, for $2,000 drawn to the receiver's own order was deposited in this account, although the check stubs do not show it; but neither do they show the deposit of $2,436.08 Babylon Mills and Lumber Company item which it is admitted was deposited in his account on August 6th, 1931. The check stub entries are plainly incomplete, but during the whole receivership period the Milton L. Dake Company bank account was frequently overdrawn—apparently that was its normal condition. Without the use of receivership funds it would have been overdrawn oftener than it was.

Now as to the withdrawal of cash from this account by the receiver. He testified that the receivership funds deposited therein were withdrawn by him from time to time in small amounts of from $200 to $500 and the cash placed in a safe deposit box in a Newark bank. The check stubs show withdrawals by the receiver amounting to $28,081.90 during the receivership period of thirty-one months. Most of the withdrawals were marked for "salary" or "traveling expenses." During that same period the receiver personally is credited on the check stubs with deposits amounting to $10,168.94. Add to this amount the Babylon Mills and Lumber Company item of $2,436.08 and the receiver's check for $2,000 dated October 30th, 1931, and we have $14,605.02 of total deposits by the receiver in this account. The net amount of his withdrawals during this period is, therefore, $14,476.88, or approximately $467 per month, slightly more than $100 a week. He had no other visible source of income; he had to live, and his story of $7,000 in cash in a safe deposit box seems a myth and does not appeal to the reasoning mind. The difference between this receiver and the ordinary embezzler is that he was caught after, instead of before, the restoration of most of the embezzled funds. Coincident with the filing of this supplemental memorandum I am advising an order removing the receiver and directing him to account to a substituted receiver thereby appointed.